## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

John A. James, *et al*.,                                        Case No. 3:19-cv-01498

           Plaintiffs,

      v.

Norfolk Southern Railway Co., *et al*.,                **ORDER**

           Defendants.


This case arises out of Defendant Norfolk Southern Railway Company's decision to terminate Plaintiffs' employment and Plaintiffs' subsequent challenge to that decision. Plaintiffs only remaining claim in this case is for retaliation under the Federal Railroad Safety Act, 49 U.S.C. § 20109 (the "FRSA").

Before me are the parties' counter-motions for summary judgment. (Docs. 92, 96). Defendants filed their motion on October 23, 2023. (Doc. 92). Plaintiffs filed a combined response and counter-motion. (Doc. 96). Defendants filed a combined opposition and reply (Doc. 97), and Plaintiffs filed a reply and sur-reply. (Doc. 100).

For the reasons explained below, I grant Defendant's motion for summary judgment and deny Plaintiffs' counter-motion for summary judgment.

### Background

Plaintiffs John A. James and Aaron Tiffany worked for Defendants. Plaintiff James was a train conductor and Plaintiff Tiffany was a train engineer. (Doc. 92-2, PgID. 932, 935; Doc. 92-3, PgID. 1083). Their supervisor was Trainmaster Thomas Moon. (Doc. 92-2, PgID. 932.; Doc. 92-3, PgID. 1078).

1

Plaintiffs worked on a project referred to as "the B55." They explain that the B55 was an "industrial switcher." (Doc. 92-2, PgID. 933; Doc. 92-3, PgID. 1084). They delivered and picked up either loaded or empty cars. (Doc. 92-2, PgID. 936). The amount of time it took Plaintiffs to perform their B55 work varied from day to day. (*Id*. at PgID. 939).

Moon instructed Plaintiffs to remain at the rail yard for a minimum of six hours per B55 shift. (*Id*. at PgID. 961). The parties characterize the six-hour minimum as "protecting the job" from being eliminated. Plaintiff Tiffany testified, "if it looked like we were working less than six hours, corporate would probably look at it and say, 'this job's not working when it's supposed to. We're just going to get rid of that job.'" (Doc. 92-3, PgID. 1086).

Defendants paid Plaintiffs for a minimum of eight hours of work per B55 shift, regardless of how long Plaintiffs took to perform the work. (Doc. 92-2, PgID. 949–950). Occasionally, Plaintiffs would complete their B55 job duties in less than six hours. (*Id*. at 949–951). On those days, Moon instructed Plaintiffs to remain at the yard office until the six hours expired.

During the time that Plaintiffs remained at the rail yard after they completed their duties, but before the six hours expired, Defendants could have assigned them other tasks to perform. Plaintiff James testified that never happened. (*Id*. at PgID. 951–952). Once the six hours expired, Defendants required each employee to record their time (sometimes referred to as "mark off" or "tie up"), at a computer terminal before going home. (*Id*. at PgID. 953). Defendants' timekeeping record system is referred to as "crewcall" or the "Crew Management" system. (*Id*.).

On July 26, 2017 at 12:01 p.m., Plaintiffs reported to work at the Defendants' South Bend yard office for the start of their B55 shift. (*See* Doc. 92-2, PgID. 932; Doc. 92-3, PgID. 1081–1092). First, Plaintiffs completed paperwork and a safety briefing. (*Id*. at PgID. 938). Then, they proceeded to drop off or pick up cars at various industrial businesses. (*Id*.).

They finished their B55 tasks that day sometime before 3:40 p.m. (Doc. 92-2, PgID. 959–960). Moon did not give Plaintiffs any additional tasks to complete after that. (*Id*.) Thus, Plaintiffs returned to the South Bend yard office and waited for their six-hour shift to expire. (*Id*.)

Defendants' timekeeping records show that on July 26, 2017, Plaintiff Tiffany and Plaintiff James recorded their exit time at 5:59 p.m. and 6:00 p.m., respectively.  (Doc. 92-4, PgID. 1202).

Later that day, at about 7:20 p.m., Moon and Plaintiff James communicated via text message:

> **Moon**: You're not protecting your job. Check the clock
>
> **James**:  I put off at 603 I thought. Thomas I wouldn't screw u like that Arron has his at 600pm…. And I told him no to wait another minute so it would be 601pm for him
>
> **Moon**: Ok well crewcall is showing 559p and 600p respectively.
>
> **James**: Shit…. I give you my word It won't happen again. I could have sworn I changed my time to 603p because of the 2 minutes delay. I got distracted by a phone call from my mom
>
> I know…. The 2 minute delay. What can I do to make it right with u Tom?
>
> **Moon**: I cannot stop automated reports from generating. I have been questioned in the past from people in corporate.. I think the baby has already been born, we will see how it goes.
>
> **James**: I know. We got back to the office at 340pm and set at the office until time to put off. I hope u know I would never disrespect you like that on purpose. Usually I put off first and I got distracted. No excuses.

(*Id*. at PgID. 1207–1210 (errors in original)).

Defendants charged Plaintiffs with failing to follow Moon's verbal instructions in violation of Defendants' rules. Plaintiffs were union members, and the applicable Collective Bargaining Agreement ("CBA") afforded them an investigative hearing before they could be terminated. (*See e.g.*, Doc. 92-5, PgID. 1425).

On August 3, 2017, the investigative hearing was held. (Doc. 92-4, PgID. 1170). Matthew Myers, a Defendant employee, was the hearing officer. (*Id*.). Plaintiff James, Plaintiff Tiffany, and

Moon appeared. (*Id*.). Kevin Dunkin, the First Vice Local Chairman representative for the union also attended. (*Id*.).

On August 17, 2017, Myers found both Plaintiffs responsible for violating Defendants' rules. (*See* Doc. 92-4, PgID. 1235; Doc. 92-4, PgID. 1331). Defendants terminated Plaintiffs. (*Id*.) Both Plaintiffs requested an Occupational Health and Safety Administration ("OSHA") Public Law Board review of Myers' decision. (*See* Doc. 92-4, PgID. 1271; Doc. 92-4, PgID. 1334). The OSHA Board upheld Myers' decision. (*Id*.). Thereafter, Plaintiffs filed this lawsuit.

Defendants maintain that they properly terminated Plaintiffs for violating a Norfolk Southern rule requiring them to follow the verbal instructions of their Trainmaster. Norfolk Southern's rules require employees to always follow the instructions of their supervisor, and failure to do so is considered insubordination. (*See* Doc. 92-5, PgID. 1404). Defendants maintain that Plaintiffs violated Moon's instruction that Plaintiffs work a minimum of six hours before marking off.

Plaintiffs do not dispute that Defendants' rules required them to follow Moon's instructions in this regard. They do not dispute that Moon instructed them to remain on the clock for a minimum of six hours on July 26, 2017. Nor do they dispute that the crewcall system indicates that they clocked out before the minimum six-hour mark on that day.

Plaintiffs argue that Defendants' computer system automatically subtracted two minutes from the time they marked off. (*See* Doc. 6, PgID. 1484–1485). In other words, they argue that Plaintiff James clocked out at exactly 6:02 p.m., and Plaintiff Tiffany clocked out at exactly 6:01 p.m.. But when they pushed the "enter" button on the computer, the crewcall system automatically subtracted two minutes from their time. (*Id*.). This adjustment, Plaintiffs argue, resulted in generating false time records for their work on July 26, 2017. (*Id*.).

Plaintiffs do not provide any explanation for the alleged automatic time adjustment. They aver that the glitch occurred only when employees tie or clock *out*, and not when they clock *in*. They do not argue that the adjustment occurred every time an employee clocks out.

Neither Plaintiff was aware of the alleged time adjustment when it occurred on July 26, 2017. Neither reported to Moon or anyone else at Norfolk Southern that their mark-off time was inaccurate.

Plaintiffs' position is that they were not fired for failing to work a full six-hour shift. Rather, they argue, they did work a full six-hour shift. They were fired because they did not falsify their time records. (*See* Doc. 96, PgID. 1490). They believe that Defendants knew about and purposefully permitted the two-minute time adjustment. (*Id*.). Defendants "use[] [the automatic adjustment] to comply with the federal regulations regarding recording and reporting hours of duty records." (*Id*.).

Plaintiffs' argue that they were "[p]unished" for "refusing to inaccurately report their hours-of-service," which is "a direct violation of the federal statute against retaliation." (Doc. 96, PgID. 1483). They argue that the two-minute "backdating" is "a safety issue that implicates any train employee who has ever marked off duty twelve hours after going on duty…" (*id*. at PgID. 1492), and that their termination is unlawfully retaliatory.

Defendants maintain that they terminated Plaintiffs for failing to follow Moon's instructions to work a six-hour shift. (Doc. 92-1, Pg.ID. 885.) Defendants deny that they retaliated against Plaintiffs; rather, they properly fired Plaintiffs for violating Norfolk Southern's rules.

I discuss the merits of both parties' positions below.

**Legal Standard**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id*. at 323. The movant need not produce evidence to show this absence; instead, it may discharge its burden by pointing out to me an absence of evidence to support the nonmovant's case. *Id*. at 325.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the nonmovant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But the nonmovant must show that there is sufficient evidence that would allow a jury to find in its favor. *Anderson*, *supra*, 477 U.S. at 249.

"If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id*. at 249–50 (internal citations omitted). "The mere existence of a scintilla of evidence" in plaintiff's favor is insufficient. *Id*. at 252. My task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020); *accord Anderson*, *supra*, 477 U.S. at 248 ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The standard of review for counter-motions for summary judgment does not differ from the standard when one party files such a motion. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "[T]hat both parties have moved for summary judgment does not mean that the court must grant summary judgment as a matter of law for one side or the other." *Morr v. Kamco Indus., Inc.*, 548 F.Supp.2d 472, 477 (N.D. Ohio 2008).

## Discussion

Plaintiffs' only remaining claim in this case asserts that Defendants violated the FRSA, 49 U.S.C. § 20109(a)(2) and (a)(7). Defendants argue that Plaintiffs fail to establish a *prima facie* case under either subsection.

For the reasons that follow, I agree with Defendants.

### *Prima Facie* Case

Section 20109 of the FRSA sets forth "Employee Protections" under the statute. Section 20109(a)(2) and (7) state:

> (a) A railroad carrier engaged in interstate or foreign commerce, a contractor or a subcontractor of such a railroad carrier, or an officer or employee of such a railroad carrier, may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done—
>
> (2) to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security;
>
> […]; or
>
> (7) to accurately report hours on duty pursuant to chapter 211.

49 U.S.C. § 20109(a)(2) and (a)(7).

The Sixth Circuit explains the elements a litigant must show when bringing such a lawsuit, as well as the burden of proof:

> The FRSA incorporates by reference the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, under which an employee must show that (1) he engaged in protected activity; (2) the employer knew that he engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action.

*Consol. Rail Corp. v. Dep't of Labor*, 567 Fed. App'x. 334, 337 (6th Cir. 2014) (citing *Araujo v. New Jersey Transit Rail Ops., Inc.*, 708 F.3d 152, 157 (3d Cir. 2013)).

Once Plaintiffs set forth these four elements, "by a preponderance of the evidence," then the burden shifts to the employer to demonstrate, "by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected behavior." *Id.* (citing 29 C.F.R. § 1982.109(b)).

**Protected Activity**

Defendants first argue that Plaintiffs did not engage in "protected activity." (Doc. 92-2, PgID. 896). Plaintiffs argue that they engaged in protected activity when they (1) "refused to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security;" and (2) "accurately reported hours on duty pursuant to chapter 211." 49 U.S.C. § 20109(a)(2) and (a)(7). (Doc. 96, PgID. 1489–1494).

### 1. § 20109(a)(2)

Plaintiffs' do not satisfy their burden to show that they engaged in protected activity under § 20109(a)(2). First, they do not identify a federal law, rule, or regulation relating to railroad safety or security. Second, their admission that they did not "refuse" to do anything contradicts the statutory showing.

By the statute's terms, Plaintiffs' allegation under § 20109(a)(2) must be tied to a railroad safety or security law or rule that the employer allegedly violated to proceed. An example of a § 20109(a)(2) violation is a plaintiff's refusal to ignore equipment defects that result in unsafe conditions. *See Fresquez v. BNSF Railway Co.*, 52 F.4th 1280 (10th Cir. 2022). Another example

is a plaintiff's refusal to lie and state that an injury to his eye, which occurred during work hours, occurred off-site and after-hours. *See Blackorby v. BNSF Railway Co.*, 936 F.3d 733 (8th Cir. 2019).

Plaintiffs here do not specifically name a safety law, rule, or regulation at issue. (*See* Doc. 96). Though Plaintiff's § 20109(a)(2) claim is imprecise, I interpret it as a belief that Defendants' alleged inaccurate time records implicate the Hours of Service Act. To the extent Plaintiffs are arguing that Defendants violated(a)(2) under a different theory, they have failed to articulate what that theory is, so I need not address it.

The Hours of Service Act:

> was enacted by Congress "to promote the safety of employees and travelers upon railroads by limiting the hours of service of employees and by requiring railroads to provide crew members with a certain number of off-duty hours for rest between shifts." *Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe. R.R. Co.*, 516 U.S. 152, 153–54 (1996). "The statute, in effect, makes the determination that a train employee who remains on duty for more than 12 consecutive hours will be too fatigued to operate a train in a safe manner." *Id.* at 157. To that end, the Hours of Service Act instructs that "[a] railroad carrier and its agents may not require a train employee to remain on duty for a period in excess of 12 consecutive hours." 49 U.S.C. § 21103(a)(2). Railroad companies are responsible for compliance and are expected to "schedule operations and crew assignments with some precision, for if operations require the crew to be on duty for more than 12 hours, the railroads may incur substantial penalties." *Bhd. of Locomotive Eng'rs*, 516 U.S. at 154.

In the case *Norfolk Southern Railway Co. v. United States Dep't of Labor*, No. 21-03369, 2022 WL 17369438 (6th Cir. Dec. 2, 2022), the plaintiff train engineer and his co-worker were nearing the end of a twelve-hour shift when their trainmaster ordered them to perform a task that they believed would exceed restrictions under the Hours of Service Act. *Id.* at *1. Rather than start the new task, the plaintiff wanted to wait for their third-shift relief to arrive. *Id.* The plaintiff's supervisor told him not to delay and to begin the task. *Id.*

The plaintiff called his union representative for advice while his co-worker began the task. *Id.* at *2. The plaintiff's co-worker completed the task, which took him over fifteen minutes past a

twelve-hour maximum shift. *Id*. The plaintiff's supervisor placed the plaintiff on suspension for failing to perform the task. *Id*.

The plaintiff argued that his refusal to perform the task was a protected activity under § 20109(a)(2). He argued that he was suspended in retaliation for refusing to perform a task that would have resulted in a violation of the Hours of Service Act. *Id*. at *3. The administrative law judge and appellate review board agreed with the plaintiff. *Id*. In other words, they found that the plaintiff engaged in a protected activity when he refused to exceed the twelve-hour maximum, and that he was improperly fired as a result. The Sixth Circuit Court of Appeals agreed. *Id*. at * 9.

Plaintiffs here present a different argument than the plaintiff in *Dep't of Labor*, and it is difficult to decipher exactly what their position is. They strongly disavow that the twelve-hour maximum work limitation under the Hours of Service Act is implicated at all. Indeed, they admit, "Plaintiffs were not close to reaching their maximum time on duty[.]" (Doc. 96, PgID. 1483).

Instead, Plaintiffs argue that the protected activity occurred when they refused to abide by Defendants' "automatic adjustment of Plaintiffs' off-duty time" by two minutes. (Doc. 96, PgID. 1489). Plaintiffs argue that their "refusal" was a "refus[al] to misrepresent the time they went off duty. They simply reported [their time] accurately." (*Id*. at PgID. 1494).

This is nonsensical. If Plaintiffs "simply reported [their time] accurately," then they would not simultaneously argue that their hours were inaccurately short by several minutes. If Plaintiffs believed that Defendants were unlawfully requiring them to subtract two minutes from their time, they did nothing to "refuse" this alleged practice, as the statute requires.

This is unlike the plaintiff in *Dep't of Labor*, where the plaintiff told his supervisor that the final task of the day would exceed his twelve-hour maximum and refused to perform it. *Dep't of Labor*, *supra*, 2022 WL 17369438. This is also unlike the plaintiff in *Fresquez*, who refused to

stay silent when he was aware of a mechanical defect. *Fresquez*, *supra*, 52 F.4th 1280. And this is unlike the plaintiff in *Blackorby* who refused to falsify where his eye injury occurred. *Blackorby*, *supra*, 936 F.3d 733.

Here, Plaintiffs simply marked off at Defendants' computer station and went home. Even if Plaintiffs did not notice the alleged reporting error at the time, they did nothing after they learned of it.

Tellingly, Plaintiffs do not cite to any cases where a plaintiff did nothing in the face of an instruction or directive that he or she believed violated a safety statute. Indeed, Plaintiffs' reading of the law would essentially eviscerate the statute's purpose of protecting employees who engage in protected conduct from retaliation.

Plaintiff Tiffany also admitted he would not have done anything, or refused to do anything, about the time discrepancy even if he had known about it:

> Q Did you ever put in a time claim for those two minutes?
>
> A No, sir.
>
> Q You could, though, because you're paid to the minute; right?
>
> A But if it's under eight hours it doesn't really matter. I was getting paid eight hours no matter what.
>
> Q That's true. But on those occasions when you were working more than eight hours, you got shorted two minutes every day according to you; is that right?
>
> A It's -- as far -- yeah.
>
> Q So did you ever submit a time claim looking to get paid for that?
>
> A No, I did not.
>
> Q Why not?
>
> A The bureaucracy of the Norfolk Southern in trying to get timeslips claimed is just swamping my local chairman with paperwork, which is unneeded.

Q So you walked away from two minutes every day for years because you wanted to be nice to your local chairman; is that what you're testifying?

A They are overworked individuals. Yes. I am -- like I said, it's not worth my time to put in a timeslip for two minutes when it's going to take ten years to even get a dime on a dollar paid for that.

(Doc. 92-3, PgID. 1119–1120).

I also reject Plaintiffs' misdirected and perplexing argument that:

Plaintiffs did not have to explicitly "refuse" to fudge their off-duty time to have engaged in a protected activity, and even if accurate time reporting is only required regarding hours-of-service violations, it is still a protected activity if Plaintiffs believed they were required by regulation to honestly report their off-duty time in all circumstances.

(Doc. 100, PgID. 1631). Plaintiffs do not cite to any law in support of this conclusory statement.

Moreover, this argument conflates Plaintiffs' positions under § 20109(a)(2) and (a)(7), and is not

helpful to Plaintiffs' case.

Finally, both Plaintiff James and Plaintiff Tiffany admitted in their depositions that they never

received an instruction they failed to follow.

Plaintiff James admitted this in his deposition more than once:

Q Okay. So let me ask you, did you receive an instruction by someone in Norfolk Southern management that you refused to comply with?

A No.

(Doc. 92-2, PgID. 1031). Plaintiff James testified further:

Q: All right. With regard to paragraph 61, where it says a "Refusal to misreport their time on duty," what instruction did you refuse here or is there an instruction that you refused?

A This is the first time I'm seeing this, sir. And my -- my counsel --

Q Okay. Well, let me change -- yeah, let me change the question then.

A Okay.

> Q Did you receive any instruction from any manager or supervisor at Norfolk Southern -- did you receive any instruction from somebody like that that you refused to abide by?
>
> A Can you repeat that, please, so I know I get the answer right, or -- or –
>
> Q Sure. Did you receive any instruction by a manager at Norfolk Southern that you refused to abide by?
>
> A I never refused to abide by, no.

(Doc. 92-2, PgID. 1023-1024).

Plaintiff Tiffany admitted the same:

> Q Let me just ask you, Mr. Tiffany, on July the 26th, 2017, did you ever make a refusal of an instruction given to you by anybody at Norfolk Southern management?
>
> A I did -- no, I did not refuse any instruction.

(Doc. 92-3, PgID. 1116).

Accordingly, I reject Plaintiffs' argument that they "refused" to do anything in a manner that would constitute a protected activity. Plaintiffs have not established that they engaged in a protected activity under § 20109(a)(2) as a matter of law.

**2. § 20109(a)(7)**

Next, Defendants argue that Plaintiffs have failed to set forth a *prima facie* case under § 20109(a)(7). Many of the points Plaintiffs argue overlap with the arguments they made under § 20109(a)(2), which I have already rejected and need not analyze again.

Section 20109(a)(7) protects Plaintiffs who "accurately report hours on duty *pursuant to chapter 211*." 49 U.S.C. § 20109(a)(7) (emphasis added).  Chapter 211 addresses "Hours of Service" 49 U.S.C. § 21101 *et seq*. This provision includes the twelve consecutive hour limitation on an employee's hours on duty. 49 U.S.C. § 21103. It also contains 49 U.S.C. § 21107, which

authorizes a railroad carrier and union to permit employees to work shorter hours of service and time on duty, such as the six-hour shift at issue here.

Plaintiffs aver the alleged automatic subtraction of two minutes from their time records violates § 20109(a)(7) because it "implicates any train employee who has ever marked off duty twelve hours after going on duty[.]" (Doc. 96, PgID. 1492).

Yet, Plaintiffs admit that this scenario does not apply to them. Plaintiffs only worked for five hours and fifty-eight minutes, and five hours and fifty-nine minutes on July 26, 2017. Neither Plaintiff was close to the twelve-hour cutoff. (*Id*.). Indeed, they admit they were "not at risk of outlawing," or exceeding, the statutory limitations. (*Id*.).

In essence, Plaintiffs advocate for a strict liability standard under § 20109(a)(7). I reject Plaintiffs' argument that Defendants' alleged "automatic backdating" of their mark-off time is a *per se* violation of the statute. Plaintiffs do not cite to any precedent for interpreting § 20109(a)(7) in this way. I decline to do so.

Accordingly, I find that Plaintiffs have not set forth *prima facie* evidence that they engaged in protected activity under § 20109(a)(7). I have found that Plaintiffs failed to set forth a necessary element of their FRSA claim and I need not analyze the remaining elements.

However, I briefly mention that Plaintiffs claim would fail in any event because they do not demonstrate that Defendants had knowledge of the protected activity, nor have Plaintiffs established a link between the protected activity and their termination.

**Defendants' Knowledge and Link Between Protected Activity and Termination**

Plaintiffs have not set forth *prima facie* evidence that Defendants knew that Plaintiffs engaged in any protected activities, nor have they established a link between the alleged protected activity and their termination.

Plaintiffs conflate their *prima facie* burden to demonstrate knowledge that the employee engaged in the protected activity with their belief that Defendants had knowledge of an alleged computer system flaw. (Doc. 96, PgID. 1494). Plaintiffs have not demonstrated admissible evidence that a computer system flaw even existed, much less evidence that Defendants knew of the alleged flaw.

Defendants provided a declaration of Phil Bergman, who worked at Defendants' company during 2017. (Doc. 97-1). Bergman explains that he was responsible for overseeing Defendants' "Crew Management" system, which is the system that contained the official "railroad time," which is the one uniform timekeeping system applicable to all Defendant employees. (*Id*. at PgID. 1621). He was responsible for ensuring compliance with federal regulations related to Hours of Service. (*Id*. at PgID. 1621 –1622). Thus, he has personal knowledge of Defendants' timekeeping system and its accuracy during the relevant time period.

Bergman avers that: (1) he is not aware of any Federal Railroad Administration ("FRA") findings of violation with Defendants' Crew Management system, despite the FRA's periodic inspections; (2) when an employee hits the "submit" button at the end of his shift, "the actual time in the system when the button was pushed is used as the employee's off-duty time for hours of service recordkeeping service. That time is the actual time on the railroad that the employee went off duty." (*Id*. at PgID. 1622). In other words, Bergman provides evidence that Defendant was not aware of any automatic subtraction of time, if it indeed occurred.

Plaintiffs' evidence that the crew management system subtracted two minutes from their time at mark-off is: (1) their own testimony and (2) the affidavit of Arin Johnson. Neither is sufficient to overcome summary judgment in favor of Defendants.

First, Plaintiffs present James' testimony.[1] Plaintiff James' testimony indicates that he does not know whether Moon or anyone else knew about the supposed error in the system:

> Q How is Mr. Moon's instruction to you not to go off duty until after six hours the reporting of inaccurate time?
>
> A I'm not saying that personally him, but the way the system is is that it falsely sends a false time to the system.
>
> Q Okay. So the system – you're saying that Mr. Moon intentionally did anything here. It's that you believe the system is inaccurate; is that correct?
>
> A Correct.
>
> Q And at some point, did you tell anyone in Norfolk Southern management that you believed the system was reporting inaccurate time?
>
> A Could you be more specific, like after or during?
>
> Q Well, let's start with, you know, before July the 26th, 2017. Did you ever tell anyone in Norfolk Southern management that the system was reporting time inaccurately?
>
> A It might have been brought up.
>
> Q You could have, but you just don't remember?
>
> A Right. It's been a while ago.
>
> Q Do you ever remember specifically telling anyone in Norfolk Southern management that the system was reporting inaccurate time?
>
> A I -- I don't recall 'cause everybody knew about it.
>
> Q And what you're talking about is that two-minute delay thing?
>
> A The two-minute back up. It backs the time up two minutes, yes.
>
> Q Okay. So everybody knew about that, and everybody talked about that is what you're saying, Mr. James?

---

[1] I reject Plaintiffs' argument that Moon's failure to follow up with Plaintiff James in their July 26, 2017 text exchange regarding the "two minutes" is an admission of anything. (Doc. 100, PgID. 1635). Moon texted Plaintiff James because Moon was notifying James that he had clocked out before his six-hour shift was over. Moon was not obligated to clarify anything in James' response text.

A Correct.

Q So this issue of the two-minute back up had been brought up by you and others in the union prior to this event; is that correct?

A I -- yes.

Q All right. Other than the system reporting inaccurate time, are you claiming that Mr. Moon's instruction to not go off duty until after six hours somehow violates a second federal rule or regulation, or is it just the one?

A Just the -- the one at hand. The one.

(Doc. 92-2, PgID. 1025 –1027).

Next is Plaintiff Tiffany's testimony. Plaintiff Tiffany testified that he had no personal knowledge about how or why the computer would subtract two minutes from his time report. He also testified, without any supporting evidence, that this flaw was something "everybody" at Defendants' company knew:

Q So when you said, "You're removing me from service for not accurately reporting my hours of service?," what was not accurate about your reporting your hours of service? What did you do that was not accurate?

A I marked off at 6:01, and he says I marked at 5:58 I believe. I don't recall the exact time but 5:58. So I accurately reported my time, and the computer backed it up two minutes.

Q What do you mean that the computer backed it up two minutes? What does that mean?

A Well, there's -- the computer backs your time up two minutes. That's all.

Q How do you know that?

A It's common knowledge. Everybody knows that. Thomas Moon knew that.

(Doc. 92-3, PgID. 1101-1102).

Plaintiff Tiffany further testified:

Q How does his instruction not to go off duty until after six hours violate the accurate reporting?

17

A Like I said, if we're -- if we're marking off at six hours, and it's backing it up two minutes, then that's inaccurate reporting hours of service.

Q All right. So it's the automatic computer system that you take issue with, not that Mr. Moon or Mr. Myers, Mr. Grace, or anybody else was intending to do something wrong. It's the computer system; is that right?

A It's general knowledge. They knew about it, so I believe that they were aware of the fact, and they still had us do it anyways.

Q Okay. And tell me again how -- I think you answered this question already by saying it's just general knowledge -- but how do you know that the computer system backs up the time by two minutes?

A When you're on the initial tie up screen, there's a computer time in the upper left-hand corner, which is the real time. And when you put it in, when you submit it, it'll back it up two minutes from that original computer time up in the corner. So the real time is not -- is in the upper left-hand corner of the initial tie up screen.

Q And there's another time that is two minutes forward from the -- so you have in the top left-hand corner the actual time, and then it gives you two minutes to fill out the paperwork, and then that's the time that actually ends up on your hours of service sheet; correct?

A I -- I don't know. I'm not a – I'm not an IT as far as paperwork and stuff goes. All I know is that there's a -- the correct time in the upper left-hand corner, and then when I submit stuff it takes away two minutes.

(Doc. 92-3, PgID. 1118 –1119). Accordingly, neither Plaintiff James nor Plaintiff Tiffany's deposition testimony evidence that Defendants knew anything about the alleged two-minute subtraction; rather, Plaintiffs' testimony is conclusory and unsupported.

Next, Plaintiffs submitted Arin Johnson's affidavit in support of their position. His affidavit falls short in several respects.

Johnson avers that he was the highest-ranking member of the local union from 2007 to 2022. (Doc. 100-1, PgID. 1638). He states that one of his duties as local chairman was to "follow[ ] every disciplinary procedure of all locomotive engineers and conductors in the Elkhart terminal and surrounding areas[.]" (*Id*.). He does not explain the relationship between the Elkhart terminal and this case. Nor does he state that he followed or had any knowledge of Plaintiffs' disciplinary

18

hearing at the time it occurred. Moreover, he states he was the local chairman "on January 26, 2017," but fails to explain how this date relates at all to the events underlying this case, which took place on July 26, 2017. (*Id*.).

Next, Johnson explains that, "At the end of a work day, a train employee must manually enter their off-duty time into the Norfolk Southern computer." (*Id*.). He states: "After the time has been submitted, the Norfolk Southern system automatically adjusts the time to read two minutes earlier than the real time submitted by the train employee." (Doc. 100-1, PgID. 1638). However, Johnson fails to explain how or whether he has personal knowledge of Defendants' timekeeping procedures or systems. Nor does he explain how he became aware of or had knowledge of the alleged "automatic" adjustment. He does not state whether he, or anyone else he has personal knowledge of, conducted any tests or analysis of Defendants' time keeping system.

Johnson's next statement is unsupported. He states:

> I spoke with Trainmaster Moon about the unusual discipline charged against John James and Aaron Tiffany for leaving before the six-hour requirement. That conversation included the severity of a permanent discharge for both Mr. James and Mr. Tiffany. Trainmaster Moon told me he had orders from "upstairs" to find a way to "get" Mr. James, that Mr. Tiffany was simply unfortunate collateral damage.

(*Id*. at PgID. 1639). Not only is this statement conclusory and largely hearsay, Johnson fails to include important details such as, for example, when this alleged conversation took place, whether it was in person or in writing, and who was present. Moreover, since both Plaintiffs have testified that they did not believe Moon intentionally or knowingly subtracted two minutes from their time records, it is unclear how this unsupported allegation makes a difference to Plaintiffs' case.

The remainder of Johnson's affidavit is similarly wanting. He states, "Trainmaster Moon and I also spoke about the two-minute backup on the time clock for the purpose of release time or checking out of work." (*Id*.) This paragraph is unhelpful, because it adds even more confusion about the timing of these alleged discussions. For these reasons, Johnson's affidavit, despite its

19

dubious admissibility (which I have disregarded) is insufficient to create an issue of material fact to overcome Defendants' motion.

Plaintiffs did not submit any other evidence, such as a forensic computer analysis of Defendants' timekeeping system, or other documentary or other admissible evidence of the time-clock theory. This is Plaintiffs' theory of the case. It is up to Plaintiffs to supply evidence that could plausibly prove this theory to a jury, which Plaintiffs failed to do.

Finally, Plaintiff Tiffany's testimony forecloses the possibility of retaliation altogether:

> Q Any reason that you believe you were retaliated against that you haven't already testified about?
>
> A I don't believe I was retaliated against.

(Doc. 92-3, PgID. 1135-1136). Plaintiffs' entire case is based on retaliation. Yet here, Plaintiff Tiffany admits he does not believe he was retaliated against.

For all of these reasons, I find that Plaintiffs have failed to meet their burden and summary judgment should be granted in Defendants' favor.

## Defendant Would Have Taken the Same Action

Even if Plaintiffs had set forth a *prima facie* case of retaliation, which they did not do, then the burden shifts to Defendants to demonstrate by clear and convincing evidence that they would have taken the same action against Plaintiffs absent the protected activity.

Though I need not analyze this in depth since Plaintiffs have failed to meet their burden, I find that Defendants have demonstrated that: (1) Plaintiffs knew they were required to follow Defendants' rules and the instructions of their supervisor, Moon (Doc. 92-2, PgID. 932, 957; Doc. 92-3, PgID. 1078); (2) Plaintiff James and Plaintiff Tiffany knew they had to remain on duty for a minimum of six hours during their July 26, 2017 shift (Doc. 92-2, PgID. 947–948, 951, 962; Doc. 92-3, PgID. 1089); (3) Plaintiffs time sheets set forth uncontroverted evidence that they left work

20

one and two minutes before the expiration of their six-hour shift. (Doc. 92-2, PgID. 1202). Defendants terminated Plaintiffs for failing to follow the instruction that they work a minimum of six hours. (*Id*.).

I therefore find that, even if Plaintiffs had set forth a *prima facie* case of retaliation, which they have not, Defendants have set forth clear and convincing evidence that they would have terminated Plaintiffs for failing to follow their trainmaster's instructions on July 26, 2017.

## Conclusion

Sometimes, very small mistakes can have drastic consequences. Here, mistakes of one minute and two minutes led to a lifetime loss of employment. From the outside, this cause and its effects appear inexplicable.

However that may be, Plaintiffs' conduct, most unfortunately for them, violated the railroad's rules. No matter how trivial the infraction, a railroad has the right, absent a retaliatory or other unlawful motive, to enforce its rules rigorously—even mercilessly.

Here, the Plaintiffs have not demonstrated that they engaged in a protected activity under either § 20109(a)(2) or (a)(7). This is a necessary element under the FRSA.

I also find that Plaintiffs have not met the second and fourth *prima facie* elements of retaliation, that the Defendants have knowledge and that the protected activity is linked to their termination.

Lastly, I find that Defendants have demonstrated by clear and convincing evidence that they would have terminated Plaintiffs for failing to follow their trainmaster's instructions on July 26, 2017.

It is, therefore, ORDERED THAT:

1.   Defendants' motion for summary judgment (Doc. 92) be, and the same hereby is, granted;

2.   Plaintiffs' counter-motion for summary judgment (Doc. 96) be, and the same hereby is, denied;

3.    Defendants' motion to strike the declaration of Arin Johnson (Doc. 101) be, and the same hereby is, denied as moot.

SO ORDERED.


                                                    _/s/James G. Carr_
                                                    Sr. U.S. District Judge